# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| **INDUSTRIAL POWER SYSTEMS INC.,** ) <br> 146 Dixie Hwy ) <br> Rossford, OH 43460 ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **KRAFT HEINZ FOOD CO., LLC,** ) <br> 200 East Randolph ) <br> Chicago IL 60601-6436 ) <br> ) <br> and ) <br> ) <br> **HJ HEINZ COMPANY LP,** ) <br> 1 PPG Place Suite 3100 ) <br> Pittsburgh PA 15122 ) <br> ) <br> **Defendants.** ) | CASE NO. 3:22-cv-1703 <br><br> JUDGE |

## COMPLAINT AND JURY DEMAND

For its Complaint against Defendants Kraft Heinz Food Company Co., LLC ("Kraft") and HJ Heinz Company LP ("HJ"), Plaintiff Industrial Power Systems, Inc. ("IPS") states as follows:

### INTRODUCTION

1. This is a breach of contract action arising out of Kraft's facility enhancement project constructed at 1301 Heinz Dr., Freemont, Ohio ("Project"). Kraft, on behalf of the property owner HJ, engaged IPS to provide certain construction services, labor, and materials for the Project.

2. Kraft designed the project and procured most of the major equipment for its improvements. IPS provided labor, supervision, and certain materials to install and construct the facility improvements.

3. After executing the Construction Services Agreement, Kraft issued a series of purchase orders to IPS for certain materials and services for the Project. Following the issuance of those purchase orders, the Project encountered unforeseen conditions and delays, which entitled IPS to extensions of time to complete its work and payment for additional costs associated with those impacts. To attempt to minimize the negative impact to the project schedule caused by these changes and conflicts, Kraft directed IPS to accelerate its performance. Later, after IPS had expended additional efforts to accelerate its performance and account for Kraft's and other delays outside of its control, Kraft refused to reimburse IPS for such costs.

4. Pursuant to Construction Services Agreement, the Purchase Orders and Ohio law, Kraft is liable to IPS for compensable delays and disruptions Kraft caused to the Project, which include design changes, unforeseen conditions, acceleration directives, added scope and indecision on key issues. As such, IPS is entitled to be paid an adjusted contract sum that accounts for wrongfully rejected requests for recovery of schedule acceleration costs and any other impacts and costs incurred at no fault of IPS. In addition, IPS is entitled to an excusable, compensable time extension and to be reimbursed for the unanticipated direct and administrative costs IPS incurred during the prolonged performance period that was caused by Kraft.

5. In breach of the parties' contract, Kraft has wrongfully refused to pay IPS the adjusted balance of the money owed to it under the Construction Services Agreement and Purchase Orders, totaling in excess of $7,659,705.00.

6. IPS submitted its notices and claims describing these related impacts as they arose during the Project. IPS and Kraft have written to one another about these claims, have met to discuss them, have claimed, responded, rebutted, and rehashed all of these disputes, but have not resolved any of them.

**PARTIES**

7. IPS hereby incorporates by reference its allegations contained in the foregoing paragraphs of the Complaint as if fully rewritten herein.

8. Defendant Kraft Heinz Food Company Co., LLC ("Kraft") is a limited liability company formed and existing pursuant to the law of Pennsylvania. Kraft is registered to do business in Ohio as a foreign limited liability company.

9. Kraft's sole members are Kraft Heinz Intermediate Corporation II, a Delaware corporation with a principal place of business in Pittsburgh, Pennsylvania, and H.J. Heinz Development Corporation, a Delaware corporation with a principal place of business in Pittsburgh, Pennsylvania. Kraft also maintains co-headquarters in Pittsburgh, Pennsylvania and Chicago, Illinois. Accordingly, Kraft is a resident of Delaware, Pennsylvania, and Illinois and no other state.

10. HJ Heinz Company LP ("HJ") is a limited partnership headquartered in Pittsburgh, Pennsylvania, and incorporated in Delaware. HJ's sole general member is Heinz GP LLC, which is incorporated in Delaware with its principal place of business in Pittsburgh, Pennsylvania. Heinz GP LLC's sole member is H.J. Heinz Company, a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

11. Plaintiff Industrial Power Systems, Inc. ("IPS") is a corporation organized under the laws of Ohio, with its primary place of business located at 146 Dixie Hwy, Rossford, OH 43460.

## JURISDICTION AND VENUE

12. IPS hereby incorporates by reference its allegations contained in the foregoing paragraphs of the Complaint as if fully rewritten herein.

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. IPS and Kraft are citizens of different states and the amount in controversy is more than $75,000.

14. The Court has personal jurisdiction over Kraft because it is a foreign limited liability company registered to do business in Ohio and transacted business in Ohio that is subject to this Complaint.

15. The Court has personal jurisdiction over HJ because transacted business in Ohio that is subject to this Complaint.

16. HJ also owns the real property located at 1301 Heinz Dr., Freemont, Ohio that is subject to this Complaint.

17. Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to this dispute occurred in Sandusky County, Ohio within the Northern District of Ohio, Western Division, and Kraft and HJ are subject to personal jurisdiction in this district.

18. In addition, this dispute involves a construction contract for the improvement of real property located in Sandusky County, Ohio. As such, Ohio Revise Code 4113.62 applies to the parties' Construction Services Agreement and this Project.

19. The parties' dispute is governed by the laws of the State of Ohio. *See* Ohio Revise Code 4113.62(D).

20. Venue is also proper pursuant to Ohio Revise Code 4113.62(D) because the contract in dispute is a construction contract, IPS is an Ohio resident, the construction and

improvement occurred in Freemont, Ohio, and the events giving rise to IPS's claims occurred in Freemont, Ohio.

## FACTS

21. IPS hereby incorporates by reference its allegations contained in the foregoing paragraphs of the Complaint as if fully rewritten herein.

22. On or around September 28, 2020, Kraft and IPS entered into a Construction Services Agreement for the Project. A true and correct copy of the Construction Services Agreement is attached hereto **Exhibit A** and incorporated herein by reference.

23. The work was performed during and, in part in response to, the Covid-19 Pandemic.

24. Article 1(c) of the Construction Services Agreement provides "If Kraft Heinz or supplier can demonstrate that a Specifications change will impact Suppliers' ability to perform Services on time, the parties will negotiate an equitable adjustment to the delivery schedule for Services."  An "equitable adjustment" is a term of art meaning an increase in the contract price to fairly compensate the contractor for the impact of changes of scope and changes circumstances of performance for the project that are outside of its control.

25. In addition, the parties agreed to four separate purchase orders for the Project covering various IPS scopes of work and materials. The purchase orders include and incorporate Standard Terms and Conditions of Purchase, which also provide IPS the right to an equitable adjustment under Article 6. True and correct of the Standard Terms and Conditions of Purchase are attached hereto as composite **Exhibit B** and incorporated herein by reference.

26. The Standard Terms and Conditions of Purchase contained in the purchase orders were incorporated into the contract documents governing the parties' relationship on this Project.

27. At outset of the Project, IPS put Kraft on notice that to maintain Kraft's aggressive construction schedule IPS required clear, unimpeded working space and all owner-required and/or owner procured equipment and materials would have to be readily available for on-time installation. Kraft, however, was not able to provide IPS with consistent clear workspace and Kraft's equipment and materials were largely unavailable or had extraordinarily long lead times.

28. Kraft-driven changes and impacts happened incessantly on this Project. Each time, pursuant to Construction Agreement and Terms and Conditions of Purchase, IPS properly notified Kraft of such events so Kraft was directly involved and acutely aware. Kraft's routine response was a directive to keep working, work faster, and to sort out issues once the work was complete.

29. IPS complied with all applicable requirements for providing Kraft with notice of the impacts Kraft was causing on the Project as well as for claims and requests for equitable adjustment related to those impacts.

30. Yet, Kraft unreasonably and unjustly refused to adjust to contract time or sum to fully account for all of these unanticipated changes and costs.

31. IPS submitted a detailed pay request to Kraft for $7,659,705.00, which Kraft wrongfully rejected in its entirety.

32. To date, Kraft has refused to pay IPS for the labor and materials IPS provided to the Project totaling $7,659,705.00.

I. **Kraft's Design Errors, Omissions and Changes Increased IPS's Costs and Negatively Impacted and Delayed IPS's Work.**

33. Kraft was responsible for and performed 100% of the Project's design. The timelines, quality of and changes to that design negatively impacted IPS, and IPS is entitled to recover its costs associated with the same.

6

34. Kraft routinely changed its design to address its uncertain and changing needs as it learned both its Project and the impact of market conditions on its material and equipment selections.

35. At key junctures, Kraft's design was incomplete, specifically including rack design and other key components of the work.

36. By November of 2020, Kraft's design was still incomplete. Nonetheless, to progress the work, Kraft issued incomplete one-line sketches while noting that its design was subject to future change (which repeatedly occurred).

37. By the end of December 2020, IPS was already working off of Kraft's third set of drawings. The scope in each successive approved for construction ("IFC") drawing revision was substantially different than the owner design information against which IPS bid the work. Each set contained major changes that impacted both IPS's scope, planned duration, staffing plans, and costs.

38. Despite being on the third IFC set, open design issues and the incompleteness in Kraft's drawings continued to plague the work and negatively impact IPS's progress.

39. IPS wrote about this subject repeatedly and placed Kraft on continual notice before the close of 2020.

40. In January of 2021, IPS continued to work with Kraft to provide pricing and to clarify scope. Late in that month, however, there was a major Kraft footing redesign at a critical juncture and location on the project, which placed certain of IPS's work on hold and required it to redirect its labor elsewhere on the project to less efficient tasks.

41. When IPS opened and removed some of the concrete floor slab to install Kraft's equipment foundations in their planned locations, IPS discovered abandoned pre-existing

foundations beneath the concrete floor not shown on Kraft's plans or drawings. These discovered existing foundations were in the direct path of the newly designed work provided by Kraft that IPS had studied, bid, and planned to install.

42. IPS also discovered more under-slab lines running though the main beam of the building and explained to Kraft that this created a "tremendous slowdown" of its work.

43. Kraft's original design also required IPS to attach new steel columns to existing slab-on-grade with steel anchor bolts. The shop drawings provided by Kraft's engineers, however, did not comport with actual conditions found on site, and the work as designed by Kraft could not be performed.

44. IPS's structural steel fabrication entirely stopped while Kraft re-designed the related structural steel components. Until Kraft completed the redesign to account for foundation changes, IPS could not know what sizes and types of steel members would be required and therefore could not procure the necessary steel and begin the fabrication process. The redesign process lagged and caused significant delays.

45. This was an owner-directed design change, owner-caused delay, and owner-driven disruption to IPS's planned time and cost for its performance. This significantly changed and increased IPS's scope of work and caused delays in commencement of planned activities and disrupted IPS's workforce. IPS's planned labor hours skyrocketed as a result.

46. These are all unforeseen conditions not shown in Kraft's drawings. Working through them constitutes a compensable changed condition.

47. It cannot be disputed that the discovery of abandoned foundations not shown on Kraft's plans increased IPS's scope and negatively impacted its plan.

48. Moreover, Kraft's on the fly changes to its drawings directly and/or constructively altered IPS's means and methods of performance and scope. As a result, IPS also submitted and asserted a request for equitable adjustment to Kraft, which Kraft rejected in full.

49. IPS is permitted to perform its work as bid, contracted, and as designed by Kraft. Kraft, by issuance of its approved for construction design, warranted such design was buildable. While Kraft is entitled to change that plan, scope, and sequence, it is also required to pay for those changes. Specifically, as is here, if doing so harmed IPS financially, those compelled changes in its method and means are compensable.

50. Kraft's design changes also added quantities (material costs) and labor to install the extra work.

51. Kraft had a certain volume of piping identified in its bid set. IPS far exceeded that volume due to Kraft's design changes.

52. The quantity of stainless conduits required by Kraft was specifically agreed and clarified in pre-job kick-off meetings. In the field, Kraft issued change directives to modify the quantity of stainless-steel conduits but rejected IPS's change orders and refused to track and pay for such changes. This was a compensable owner change based on its material preference that resulted in the addition of both vertical and horizontal stainless conduits to IPS's scope.

### II. Kraft Failed to Timely Deliver Major Equipment and Materials.

53. Kraft was also responsible for and procured all major equipment and many key materials. Kraft's deliverables arrived later than planned and/or out of planned and scheduled sequence, requiring IPS to perform differently and less efficiently than scheduled. As such, IPS is entitled to recover for these changed conditions and disruptions.

54. Kraft's piecemeal delivery of critical materials and equipment at key moments required IPS to jump around to available work areas out of order, out of sequence, and decimated its progress. This negatively impacted IPS's performance and its ability to perform the work as planned in a logical sequence. This resulted in decreased productivity, and significantly increased IPS's costs.

55. Kraft's difficulties in acquiring owner-supplied equipment on a timely basis not only impacted installation once the equipment arrived on site, but also impacted later design tie-ins.

56. By February of 2021, it became clear that manufacturing delays of insulated metal panels ("IMP") for the Project due to market factors and scarcity were causing massive delays. This combined with simultaneous weather shutdowns that in a small part directly impacted the Project site, and to a greater extent impacted manufacturing of IMP Panels in Texas.

57. Kraft responded by approving IPS's installation of certain electrical and mechanical work out of sequence so that work could proceed before, instead of after, installation of IMP Panels. IPS warned that there would be significant inefficiencies due to the complexity of the work, how labor intensive it was, and the more complex nature of installing this work out of order. Kraft directed IPS to proceed, nonetheless. Those additional costs were incurred by IPS but not compensated by Kraft.

58. A month later, on or around March 16, 2021, IPS confirmed that delivery lag of certain owner equipment, coordinating with beam hoisting, was interfering with other planned work, and putting certain work on hold.

59. On or around March 17, 2021, IPS provided Kraft with a list of late owner-supplied or directed equipment and materials that were critical, had long lead times, and were impacting final design and installation in the field.

60. By the end of March 2021, Kraft still did not have the IMP Panels.

61. IPS confirmed that Kraft ordered the incorrect Condensate Skid, which required piping reconfiguration in the field and additional loss of efficiency. IPS confirmed that the correct Condensate Skid was no longer available and many of the items impacted had long lead times and would interject compounding delay and disruption. For instance, food-grade tubing and accessories had a 30–35-week lead time.

### III. Kraft Changed Site Access Requirements During the Project.

62. Covid also impacted the Project.

63. Covid impacted Kraft. Kraft's response to Covid impacted IPS.

64. On site, Kraft changed site access (Covid restrictions) which resulted in unusually long lines to obtain site access and badging problems, which affected all morning labor productivity. Site logistics became a major problem, including back-ups at Kraft's gate caused by its imposition of Covid rules, scope changes, ever-changing and inconsistent access procedures and protocols.

65. Kraft's response to Covid restrictions and implementation of procedures to navigate them was generally poor, inefficient, and clumsy.

66. Kraft was purely schedule-driven on this Project, meaning it allowed details to lapse in exchange of the appearance of progress.

67. When Kraft chose to continue work (rather than stopping or extending the completion dates) during Covid, Kraft assumed the risk and costs associated with Covid-related

delays and impacts and took responsibility for the extra contractor costs (including inefficiencies) incurred to achieve the result that was best for its business.

IV.     **Kraft Delayed Critical Design Decisions and Approvals.**

68. Kraft spent a lot of time spinning its wheels on decisions that impacted IPS's planning and performance.

69. IPS was forced to ask a disproportionate number of design related questions as Kraft's design lagged and contained an enormous number of inconsistencies and clashes.

70. Kraft required that all changes approved or responses to design-related questions by field personnel were pushed secondly through Kraft's engineers, who added an unnecessary step in approval of heavily involved field/project personnel.

71. This duplicative approval process slowed answers to IPS's questions and hindered its planning of new and changed work. Timing was a problem for roll out of nearly all of Kraft's changes.

72. Kraft also significantly delayed approval of shop drawings, which in turn delayed IPS's ordering of key materials and fabrication of others.

73. IPS promptly ordered materials based upon bills of material provided by Kraft and promptly pressed for procurement schedules from Kraft, which Kraft failed to provide.

74. On March 12, 2021, IPS notified Kraft that its late steel drawings had impacted IPS's CAD/model for follow-on design including platforms and was creating difficulty concerning coordination with conduits and hoists among other work.

75. On top of the other issues, IPS was experiencing drastic material price escalation due to Kraft driven delays to IPS's procurement schedule.

76. The material escalation significantly changed its planned cost and methods and means for construction.

77. IPS explained to Kraft that stainless steel costs were up at least 25% and that many food grade materials were simply unavailable.

## V. Kraft Accelerated IPS's Performance on the Project.

78. As Kraft-driven delays plagued the Project, IPS regularly updated the construction schedule and provided interim schedule comments to Kraft.

79. IPS notified Kraft of the impact of its late and changing design on the work and made requests for equitable adjustment to the contract price. Yet, Kraft unreasonably and unjustly refused to adjust to contract time or sum to fully account for all of these unanticipated changes and costs.

80. Kraft declined to adjust IPS's performance duration to account for added scope, negative progress impacts, and defective and changed design because Kraft needed the completed facility as quickly as possible. Finish now – address claims later. Then, Kraft denied IPS' claims.

81. Instead, Kraft accelerated IPS's performance and forced IPS to perform more and different work than planned and bid, without releasing the end date of the particular impacted scopes. Despite Kraft's actions constituting compensable schedule compression, Kraft refused to compensate IPS for the additional costs Kraft was causing IPS to incur.

82. On February 2, 2021, Kraft directed IPS to provide an acceleration plan, plan for shift work, agree to simultaneously acquire scarce IMP Panels from two different vendors and discussed performing critical tasks out of order while waiting for structural steel and engaging multiple crews. IPS was not behind schedule and its work had not lagged through any fault of its own. This was express and compensable acceleration.

83. Kraft demanded additional management resources for IPS to perform a higher volume of simultaneous work than originally planned, while IPS correctly complained that Kraft's vendors continued to be problematic and unable to provide owner-selected materials and equipment in any semblance of the planned schedule.

84. On February 5, 2021, Kraft directed IPS to expedite implementation of owner design changes, acquisition of new materials, and to propose crew changes to account for this impact due to unforeseen and differing site conditions. All those costs were incurred and are compensable.

85. Kraft's acceleration of follow-on activities increased IPS's costs.

86. Nothing in the contract documents effectively transferred that risk to IPS.

87. At Kraft's direction, IPS continued to make a massive push for people to staff work out of order, to perform more simultaneous work than originally planned, added supervision, continued to offer lookahead schedules and updates, and quoted additional work for Kraft at its request. IPS was performing quality work, by all accounts, despite these challenging circumstances. Kraft would not have provided additional scope to IPS if it were performing poorly or was not able to manage the changes.

88. Kraft knowingly, expressly, and constructively accelerated IPS's approved schedule by refusing to extend milestones regardless for owner-caused impacts.

## COUNT I
## BREACH OF CONTRACT

89. IPS hereby incorporates by reference its allegations contained in the foregoing paragraphs of the Complaint as if fully rewritten herein.

90. On or around September 20, 2020, IPS and Kraft entered into the Construction Services Agreement described above and attached hereto as **Exhibit A**.

91. Subsequently, the parties agreed to purchase orders containing Standard Terms and Conditions of Purchase, described above, and attached hereto as **Exhibit B,** which were incorporated into the contract documents governing the parties' relationship on this Project.

92. The Construction Services Agreement, incorporated exhibits, and contract documents (including, but not limited to, purchase orders containing Standard Terms and Conditions of Purchase) constitute a valid and enforceable contract between the parties, which is supported by adequate consideration.

93. Kraft materially breached the terms and conditions of the parties' contract by, including, but not limited to: (i) refusing to grant time extensions for material delays it caused on the Project; (ii) refusing to compensate IPS for delays Kraft caused on the Project; (iii) failing to pay IPS for extra work and additive scope; (iv) refusing to pay IPS for impacts caused by Kraft re-designing portions of the Project after the work was already underway; (v) refusing to pay IPS and provide time extensions for Kraft's errors and omissions and additions to the Project's design, plans and specifications and for unforeseen conditions; (vi) refusing to pay IPS for accelerating its work due to Kraft both explicitly directed and constructively caused; (vii) unjustifiability refusing to release IPS's contract retainage; and (viii) otherwise disregarding and ignoring Kraft's obligations to IPS under the parties' contract.

94. IPS has fully performed all obligations required under the terms and conditions of the parties' contract and has met all conditions precedent to the performance by Kraft.

95. As a direct and proximate result of Kraft's material breaches of the Agreement, IPS has incurred and will continue to incur direct compensatory damages related to completion of the Project, Kraft caused compensable delays, Kraft directed extra work and additive scope, Kraft's refusal to release IPS's retainage, in an amount no less than $7,659,705.00, to be more fully proven

at trial, in addition to any applicable prejudgment interest, post-judgment interest, attorney's fees and the costs of this action.

## COUNT II
## UNJUST ENRICHMENT

96. IPS hereby incorporates by reference its allegations contained in the foregoing paragraphs of the Complaint as if fully rewritten herein.

97. In the alternative to Count I, IPS claims its work on the Project bestowed a benefit on Kraft and HJ, and that Kraft and HJ were aware of the work and materials provided by IPS without paying in full for such work and materials.

98. The reasonable value of the work performed, and the material provided to the Project that Kraft and HJ failed to pay for was $7,659,705.00.

99. Kraft and HJ have been unjustly enriched by its acceptance of the work and materials provided to the Project by IPS without payment in full for the work and materials.

100. Kraft and HJ have been unjustly enriched by its acceptance and retention of the work and materials supplied by IPS without adequate compensation to IPS therefor.

101. IPS has been harmed as a direct and proximate result of Kraft's and HJ's conduct and is entitled to recover the reasonable value of the services and material provided under the equitable doctrines of quantum meruit and unjust enrichment.

## CONDITIONS PRECEDENT

102. All conditions precedent to institute this action and for IPS's claims for relief have been performed or have occurred.

**WHEREFORE**, IPS demands judgment as follows:

A. IPS prays that a monetary judgment be entered against Kraft and in favor of IPS in an amount no less than $7,659,705.00 for Count I;

B. In the alternative to Count I, IPS prays that a monetary judgment be entered against Kraft and HJ, jointly and severally, and in favor of IPS in an amount no less than $7,659,705.00 for Count II;

C. That IPS receives its costs, disbursements, interest, and attorneys' fees as provided by contract and/or law;

D. Pre-judgment and post-judgment interest as provided by the parties' contract and/or applicable law; and

E. Such other and further relief, at law and in equity, as the Court deems just and proper.

Respectfully submitted,

/s/ *Jonathon Korinko*
THOMAS O. CRIST (0064454)
JONATHON KORINKO (0088407)
JUSTIN LOVDAHL (0096958)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
200 Public Square, Suite 2300
Cleveland, OH 44114
T: 216-363-4500; F: 216-363-4588
Email: tcrist@beneschlaw.com
jkorinko@beneschlaw.com
jlovdahl@beneschlaw.com

*Counsel for Plaintiff Industrial Power Systems Inc.*

## **JURY DEMAND**

IPS demands a trial by jury on all issues so triable.

/s/ *Jonathon J. Korinko*
Jonathon J. Korinko

*Counsel for Plaintiff Industrial Power Systems Inc.*