IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Industrial Power Systems, Inc., | Case No. 3:22 CV 1703 |
| Plaintiff, | MEMORANDUM OPINION |
| -vs- | JUDGE JACK ZOUHARY |
| Kraft Heinz Food Co. LLC, | |
| Defendant. | |

## INTRODUCTION

This case stems from a construction project plagued with delays and change orders.  After the Project concluded, Plaintiff Industrial Power Systems ("IPS") recorded a mechanic's lien and brought claims for breach of contract, unjust enrichment, and lien enforcement.  Defendant Kraft Heinz Food Co. ("Kraft") counterclaimed, asserting that IPS breached the contract and that the lien was invalid.

A Bench Trial on liability included briefing (Docs. 96, 98), a parade of witnesses (*see* Docs. 103–07, 113–114, 122), and hundreds of trial exhibits.  Under Federal Civil Rule 52(a), this Court issues the following findings of fact and conclusions of law.

## BACKGROUND

Kraft undertook the Project at its Fremont, Ohio facility and retained IPS to perform portions of the civil, mechanical, millwright, and electrical work.  The two had worked together on many previous projects.  This Project was governed by a Construction Services Agreement ("CSA")

executed in late September 2020 and also by four purchase orders issued between late October 2020 and mid-January 2021 (Doc. 122 at 26–27).

Kraft used Zachry Engineering ("Zachry") as the engineering and design firm responsible for the "Issued for Construction" ("IFC") drawings and the shop drawing approvals. Zachry used an internal team, working with an on-site representative, to coordinate and drive the overall schedule. Kraft Group Lead on the Project, Loc To, was responsible for communicating schedule expectations for the Project and interfacing with IPS and Zachry (Doc. 103 at 73–75). Eric Bacher was Kraft's owner's representative who reported conditions and drawing issues from the field (*id.* at 74–75).

**Design Delays and Slow Start**

From the outset, the Project proceeded against an "aggressive" schedule that Kraft management did not want extended. That pressure appears in contemporaneous communications throughout the Project's early stages. In December 2020, when Zachry's IFC drawings had not yet been sealed or stamped, Kraft directed IPS to proceed anyway with the expectation that stamped drawings would follow (*id.* at 72–73). Around the same time, Kraft was also pushing for accelerated turnaround on drawing approvals. In a January 11, 2021 email, Loc To indicated that Zachry had not approved any of the IPS shop drawings, and emphasized the need for Zachry to "start turning the shop drawings around quickly," because Kraft wanted to minimize schedule time "lost on getting IFC completed" (*id.* at 73; Trial Ex. 214). He warned that further delay in approvals would compound the schedule problem.

Early field work revealed discrepancies between existing conditions and aspects of the then-current design. IPS's civil excavation work in the clean-in-place area ("CIP room"), became a focal example. Testimony described discrepancies in footer dimensions between the drawings and actual conditions, and the discovery of a ten-inch layer of asphalt at footing depth during excavation, which in turn required a stop-and-regroup while the design was revised (Doc. 104 at 147–49; Trial

Ex. 481). Kraft was notified of the discrepancies and the asphalt discovery, including that the Zachry drawings did not match certain field dimensions (Doc. 103 at 75–76). The same time period included other field discoveries that required adjustments, such as the discovery of unknown piping in the CIP excavation area, which raised practical questions about how quickly the work could progress while design revisions and clarifications were developed (Doc. 104 at 249–50).

### Problems Continue

As Zachry was still developing and revising portions of the IFCs, Kraft and IPS were simultaneously trying to hold to the overall Project milestones. In a December 15, 2020 communication, IPS advised Kraft that Zachry was still revising structural steel IFCs and the revisions for shop drawings and approvals would likely push steel to the "third or fourth week of January at best" (Doc. 103 at 68–69; Trial Ex. 212). Some items were placed "on hold" within Zachry's issuance process while Zachry investigated further (Doc. 103 at 65–67; Trial Ex. 473).

A related design and drawing issue that received sustained attention at trial was the "batch kitchen platform." The kitchen platform drawings were part of the civil/structural IFC set. When Zachry transmitted an IFC drawing index on December 11, 2020, the index reflected a "200 range" of drawings (STR-XXXX-201 through 212) that included the batch kitchen-platform sheets (*id.* at 66–67). Testimony described that the "200 range" sheets were missing from the transmittal -- jumping from drawing 195 to 300 -- leaving a gap in the set. Kraft and IPS then proceeded with the platform design issued later revised in stages (*id.*). In February 2021, Zachry transmitted kitchen platform drawings as IFC with "dimensional updates," and Zachry later stated it had "finalized" layout and post locations in conjunction with equipment vendor Javlyn (*id.* at 124–27; Trial Ex. 465). However, Zachry simultaneously acknowledged that "trench drain" discrepancies still needed to be resolved and there was a possibility of further updates during shop drawing approval (*id.*). Turns out Zachry was right -- the platform continued to evolve as Zachry,

Javlyn, and Universal Design and Fabrication ("Universal"), IPS's fabricator, communicated further. The emails indicated the need to "adjust the columns" and "reissue" drawings (*id.* at 128–29; Trial Ex. 597).

**Project Schedule Pressure**

Alongside these design and fabrication issues, the Project team addressed schedule compression and sequencing through meetings, attempting to avoid pushing the completion date. Testimony reflected that Kraft management expected the production date to remain fixed and pushed IPS to accelerate the work. Wymer described being told repeatedly that the end date "doesn't change" and that IPS should "figure that out and hit that date," including through overtime and changed sequencing, with an understanding that change orders could be sorted out later (Doc. 105 at 137–38). That same theme appears in contemporaneous schedule communications. Loc To acknowledged a schedule review in which Kraft's response was blunt -- "we cannot delay" -- in the context of assessing how milestones could be achieved (Trial Ex. 218).

In early February 2021, these schedule pressures converged with a "reset" or re-baselining effort aimed at preserving the Project's target completion while recognizing that certain inputs -- structural steel and insulated metal panels ("IMPs") used as clean-room walls -- were not arriving as originally anticipated. On February 2, Loc To wrote to IPS Project Engineer Matt Dearth before a management meeting, instructing that IPS should be prepared to discuss how it was going to shorten the schedule (Doc. 103 at 93–96). He was blunt: "DO NOT tell us that you don't have enough resources otherwise it will not go well. Don't say you have not look[ed] to see how we can shorten the timeline" (Trial Ex. 215). Strategies to stay on track included sourcing "IMP panels" from more than one location to manage lead times, and moving forward with other work in the meantime (i.e., performing work out of the originally planned sequence) (Doc. 103 at 94). Dearth likewise testified that this was a request to do work out of sequence and described a plan to install

4

piping and electrical in the clean-room area with the intent that IMP panels would be installed later around the hangers, which "did not go as planned" and ultimately required taking hangers down and reinstalling work -- meaning IPS "just about buil[t] the room twice" (Doc. 104 at 152–53).

**More Change Orders**

IMPs themselves became a recurring example of the interplay between design development, submittals, and schedule sequencing. Dearth testified that it was "imperative" to get approved IMP panel shop drawings back from Zachry in time (Doc. 104 at 155–56). He attributed timing problems to Zachry lagging behind, and he explained that late approvals jeopardized meeting the production schedule for the panels. The February 2021 expedited plan and out-of-sequence installation efforts were thus tied to the availability and approval of materials needed to create clean-room walls and allow installation to proceed in the intended order (*id.* at 153–57).

The Project's early field conditions and design evolution were also handled through change orders addressing discrete scope impacts. Testimony described change orders intended to "make IPS whole" when unanticipated conditions arose, including discussion of change order entries relating to the CIP room foundations and related field conditions (Doc. 105 at 160–62). In addition to the kitchen-platform change-order process discussed above, the record reflects that some change orders were treated as a mechanism for keeping the work moving, while cost and time implications would be addressed later (*id.* at 137–38).

As the design evolved, it intersected with fabrication, cost, and scope questions addressed through the change-order process. Universal communicated confusion on May 5, 2021 about which platform drawings governed, noted that shop drawings had been approved on April 9, and stated that it was "60 percent fabricated," with time and material impacts if the design direction changed (Trial Ex. 616). The fabricator also referenced the need for a purchase order before stainless steel could be purchased (Doc. 103 at 131–32). Later that month, as the platform issue persisted, Dearth

wrote to Kraft that the kitchen platform change order had been "stopped for further review," and urged proceeding so as not to "create delays" (Trial Ex. 442).  But the kitchen-platform delays spiraled into other areas.  IPS Superintendent Jeffrey Stuller explained the difficulties of installing equipment, piping, and related work due to the platform delay (Doc. 106 at 24–28).  Several tasks were backed up by weeks, and attempts to stack trades and add manpower did not resolve this bottleneck (*id.* at 23–26).

**Across the Finish Line**

The changes and delays continued.  On June 3, 2021, in an email chain addressing whether certain platform connections would be bolted or welded, Loc To wrote that he would approve proceeding with bolted connections in certain locations (Doc. 103 at 134–36; Trial Ex. 316).  He also needed to clarify some things -- such as whether gaskets or O-rings could be used to avoid metal-to-metal contact and the need to coordinate inspection before shipment (Doc. 103 at 135–36).  IPS Project Engineer Ryan Wymer testified that this email chain marked the point at which he finally received approval to proceed with the kitchen platform change order and described follow-up questions and Requests for Information ("RFIs") tied to the platform scope (Doc. 105 at 138–140).  This included a July 2, 2021 RFI about how to connect to an existing platform, where the drawings lacked connection details (*id.*).

By mid-2021, IPS and Kraft were also communicating about potential time impacts and cost/time adjustments beyond individual change orders, including the development of a request for equitable adjustment ("REA") related to the delay and disruption (Trial Ex. 10).  IPS sent Kraft an email regarding inefficiencies in early October 2021(Trial Ex. 492), followed by a formal Notice in October 2021, which outlined "the accelerated scheduled demanded by [Kraft]" and the "significant amounts of changes that impacted the original scope of work" (Trial Ex. 10).  Those submissions, and Kraft's responses and internal routing of the communications, were part of the

record developed at trial and serve as the chronology for the parties' competing narratives regarding delay and notice (*see, e.g.*, Trial Exs. 9, 11, 24–27).

Expert testimony also addressed Project scheduling and impacts. IPS offered expert testimony from Michael Birmingham, who addressed, among other topics, the Project's change orders and approvals, and the volume of change activity relative to planned completion (Doc. 122 at 6–22; 65–142). He addressed the design-related problems and their downstream effects -- specifically, the practical impossibility of generating reliable estimates when design was defective or incomplete and the need for additional information before work could proceed (*id.*). The expert materials, including the Birmingham Report, also address the relationship between purchase orders and incorporated proposal terms, and the documents outlining delay damages (Doc. 117).

### DISCUSSION

The claims at trial focused on three principal themes, including whether: (1) either party materially breached the contract; (2) IPS's recorded mechanic's lien was valid (and whether its recording supports Kraft's derivative claims for slander of title and quiet title relief); and (3) Kraft's liability on IPS's delay-related claim, including contractual notice of the delay claim.

**Kraft's Breach-of-Contract Claim**

The dispositive question at this stage is whether the evidence shows that IPS committed a *material* failure of performance, which is a failure "*so fundamental* to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Price v. KNL Custom Homes, Inc.*, 2015-Ohio- 436, ¶ 32 (Ohio Ct. App. 2015) (quoting *Marion Fam. YMCA v. Hensel*, 178 Ohio App. 3d 140, 142–43 (Ohio Ct. App. 2008)). Ohio law likewise recognizes that where a party has "substantially performed" and made a good-faith effort to comply, minor deviations do not establish breach; substantial compliance defeats a breach

finding even though disputes may remain as to money, timing, or closeout details. *Crockett Homes, Inc. v. Tracy*, 2024-Ohio-1464, ¶ 125 (Ohio Ct. App. 2024) (quoting *Thompson v. Exec. Transp. Serv.*, 2004 WL 291188, at *3 (Ohio Ct. App. 2004)).

Kraft frames its breach theory principally as a "construction management" failure by IPS, pointing to overall project delay, and arguing that IPS's handling of sequencing and pacing fell below contractual expectations (Tr.[1] at 34–38). But the liability record developed at trial does not support a finding that IPS materially failed to perform the work it contracted to complete. Instead, the record reflects a project that moved forward through extensive design and directive-driven complications, followed by a reset, and continued to evolve through change directives and change orders, with both sides documenting the schedule friction as it occurred (*see* Doc. 122 at 7–14). The fact that the Project experienced serious delay, and the parties disputed responsibility for that delay, does not, standing alone, establish that IPS breached. As Ohio's construction-delay case law recognizes, delay can be attributable to owner-furnished plans and specifications, defective or incomplete design inputs, or owner-driven changes. Absent an express agreement allocating that risk to the contractor, the contractor is not generally liable for delay "attributable to [the] contractee's plans and specifications." *Dugan & Meyers Constr. Co. v. Ohio Dep't. of Admin. Servs.*, 113 Ohio St. 3d 226, 232 (Ohio 2007) (citation omitted).

The trial evidence Kraft relies on to recast delay as a breach repeatedly blurs that distinction. IPS did not abandon performance. Rather, the contemporaneous correspondence and testimony show that many of the schedule stressors Kraft identifies -- drawing availability and revision delays, procurement delays driven by submittal approvals, and design decisions that affected field sequencing -- were being communicated to Kraft while the work continued (*see* Doc. 122 at 7–8;

---

[1] The citation "Tr." refers to the Record Oral Argument held on November 19, 2025.

Tr. at 8–11). IPS's witnesses described ongoing work, coordination, and changes being priced and administered through the Project mechanisms, rather than a refusal to perform. Dearth described the change-order process this way (*id.* at 114):

> This was a very fast-paced project as far as the deadline that we needed to be up and running by. So a lot of the time, there was no chance for a formal change order process to workup the costs, send it in, get the approval, new [Purchase Order]. It was, you need to start now, this is a problem now, we need to get moving.

Kraft's evidence further corroborates this. Kraft's procurement witness Bobby Boyd testified that broader impact items were routed through procurement and contractual review, reflecting an ongoing administration of disputes rather than a cessation of contract performance (Doc. 104 at 133–35). The scheduling analysis summarized by Kraft experts Lindsay Macioce and Gloria Koehlinger ("Rimkus"), identifies the "baseline" schedule date of February 2, 2021 and explains that the plan assumed particular progressions in civil and other enabling work necessary to support electrical installation (Doc. 122 at 35–44). But the analysis highlights how delays prevented completion of portions of the Project, which further illustrates owner-side critical-path impacts to IPS's work (Doc. 116-1 at 42–52).

Overall, the record is inconsistent with Kraft's attempt to characterize the Project's difficulties as a material nonperformance by IPS. Kraft's position depends on treating the existence of delay as proof of breach. But the evidence developed at trial does not permit this Court to transform the existence of delay into a breach finding. *See, e.g.*, *Merritt v. Anderson*, 2009 WL 975749, at *3–5 (Ohio Ct. App. 2009) (noting that a contractor's three-month delay was not a "substantial violation" of a construction contract). Simply put, Kraft did not prove that IPS committed a material breach of the contract.

One final point. The above finding forecloses Kraft's liquidated damages argument. That's because: "Where an owner and a contractor are each responsible for a certain amount of unreasonable delay in completing the work, the owner is barred from assessing the contractor with

9

liquidated damages for whatever delay might have occurred in the completion of the work." *Applied Contracting Corp. v. Ohio Dept. of Transp.*, 2011 WL 4947364, ¶ 108 (Ohio Ct. Cl. 2011) (quoting *Turzillo Contracting Co. v. Messer & Sons, Inc.*, 23 Ohio App. 2d 179, 184 (Ohio Ct. App. 1969)).

**Lien-Related Claims (Declaratory Relief/Invalidity, Quiet Title, Slander of Title)**

Kraft's three lien-related theories rise or fall largely with its contention that IPS recorded an invalid mechanic's lien (*see* Tr. at 40–47). All three fall short.

First, this Court rejects Kraft's principal "invalidity" theories. In denying summary judgment, this Court previously identified disputed fact issues about both the parcel/address argument and the timeliness argument, including evidence that Kraft itself used the challenged address in Project documents and that the recorded lien included a detailed legal description (Doc. 81 at 5–6). This Court also noted Ohio authority that an address discrepancy alone does not necessarily invalidate a lien if the property is otherwise sufficiently identified (*id.* at 4) (citing *Buckeye State Hauling, Inc. v. Troy*, 1974 WL 184519, at *2 (Ohio Ct. App. 1974)).

The trial record did not establish that IPS's lien description or timing rendered the lien invalid under Ohio lien law. On timeliness, this Court's earlier ruling recognized the legal principle that, where work is performed under a continuing contractual relationship, timeliness may run from the last date of substantial work (*id.* at 6) (citing *Guernsey Bank v. Milano Sports Enters.*, 2008-Ohio-2420, ¶ 42 (Ohio Ct. App. 2008)). IPS's lien was timely, as it was recorded within 75 days of Dearth's final work on the project. And, as far as description, IPS's 14-page legal description was valid, as it "enable[d] one to reasonably ascertain the property described in the affidavit." *Buckeye State Hauling*, 1974 WL 184519, at *2 (rejecting the proposition that a lien fails as a matter of law for a technical defect in location description where the property can be identified) (citation omitted).

Second, because this Court rejects Kraft's lien invalidity arguments, the quiet-title claim fails at the threshold for the same reason: the record does not support treating IPS's lien as an invalid cloud subject to removal in equity. *McClure v. Fischer Attached Homes*, 145 Ohio Misc. 2d 38, ¶ 14 (Ohio Misc. 2007) (noting that "the court may quiet title only when there is no adequate remedy at law").

Third, Kraft's slander-of-title claim falls short for similar reasons. Ohio courts describe slander of title as requiring: (1) publication of a slanderous statement disparaging title; (2) falsity; (3) malice or reckless disregard; and (4) actual/special damages. *Id.* at ¶ 21 (quoting *Green v. Lemarr*, 139 Ohio App. 3d 414, 430 (Ohio Ct. App. 2000)). Because the lien has not been shown false or invalid, Kraft cannot satisfy the falsity element. And, even aside from falsity, the record at this liability phase does not establish the heightened malice showing or the requisite proof of special damages flowing from the lien. *Id.* at ¶ 22 (declining summary judgment where evidence did not establish malice and special damages with the requisite specificity).

**Kraft's Contractual Indemnification Claim**

Kraft also asserts a claim for indemnification. Ohio recognizes indemnity arising by statute, by contract, and under common law. *See, e.g.*, *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St. 3d 238, 240 (Ohio 1987) (describing the distinction between contractual and common-law indemnity and the circumstances in which each applies). "In general, to indemnify is to make whole and has been defined to mean to save harmless by giving security for the reimbursement of a person in case of anticipated loss . . . ." *Id.*

At trial, Kraft grounded its indemnity theory primarily in a clause contained in the "Terms and Conditions" associated with the purchase orders and argued the clause supported fee shifting and indemnity tied to IPS's alleged breach and lien-related conduct (Tr. at 38–39). The clause

states the "supplier will indemnify, defend, and hold harmless Kraft" from all losses "arising out of or in connection with the performance of the [Project]" (Doc. 68-9 at 5).

The first problem for Kraft is that, on this liability record, it has failed to demonstrate a breach that would trigger the clause. Kraft's indemnity theory is derivative of its core liability positions -- particularly that IPS breached the contract and wrongfully recorded an invalid lien (Tr. at 38–39). But Kraft failed to prove a material breach by IPS in this liability phase, and this Court has rejected Kraft's lien-invalidity theories.

Second, even apart from the absence of a triggering breach, Kraft's requested construction of the indemnity clause sweeps too broadly to be enforceable in a construction setting. Ohio's anti-indemnity statute provides that a covenant or promise "in, or in connection with or collateral to," a construction-related contract that purports to indemnify the promisee against liability for damages "initiated or proximately caused by or resulting from the negligence of the promisee" is against public policy and void. Ohio Rev. Code ("R.C.") § 2305.31. The statute bars indemnity, irrespective of whether the promisee's negligence is sole or concurrent, to the extent it shifts responsibility for the promisee's own negligence. *Emp'rs' Fire Ins. Co. v. Danis Bldg. Constr. Co.*, 2000 WL 1234321, at *4–5 (6th Cir. 2000). *See also Inland Waters Pollution Control, Inc. v. Marra/Majestic Joint Venture*, 2008 WL 5732798, at *9 (N.D. Ohio 2008) (noting that, under R.C. § 4113.62, waivers for delays caused as "a proximate result of the owner's act or failure to act" are void) (citation omitted). To the extent Kraft reads the purchase-order indemnity language as requiring IPS to indemnify Kraft for liabilities arising from Kraft's own acts or omissions on the Project (including its design and coordination decisions and those of its representatives), the clause is unenforceable under Ohio law.

**IPS's Delay Claim**

This Court now turns to IPS's claims. First, IPS asserts its own breach-of-contract claim. This delay claim is the central liability issue remaining for damages. This Court therefore addresses in turn: (1) entitlement and causation; and (2) notice.

***Entitlement/Causation.*** As a general matter, Ohio law recognizes that construction delays may be compensable when they are caused by owner-driven changes, defective or incomplete design inputs, or other owner-responsible impediments, and when the causal link to critical-path impacts is supported by competent evidence. *See, e.g.*, *Dugan*, 113 Ohio St. 3d at 230 (recognizing contractor delay claims involving "the allocation of damages flowing from *delay* in completion of a construction project due to plan changes").

Here, IPS presented a coherent, record-supported narrative that the Project was affected by early drawing, design, and directive issues, and by ongoing change-driven impacts that continued beyond the reset. For instance, the IMP panel issue, which occurred after the reset, is one of the clearest examples of delay with record support. Dearth testified about a February 22, 2021 email to Loc To addressing IMP panels and emphasizing that timely approved shop drawings were "imperative," because without approvals the vendor could not produce the customized panels needed on Kraft's timeline (Doc. 104 at 155–57). Zachry did not meet the approval deadline, and instead issued requests for additional information (Docs. 103 at 103–05; 104 at 95,156–58; Trial Ex. 488). The record likewise reflects supply-side disruptions (including weather-related delays) being communicated to Kraft in real time as another factor affecting timing (Doc. 103 at 101–02; Trial Ex. 100). These issues then fueled field sequencing problems -- work could not proceed in the intended order because conditions were not ready (Doc. 104 at 152–53). This led to resequencing and, in some places, rework.

The same is true of the hoist-framing issue. Wymer testified that throughout the structural steel portion of the job, "just about every structural component" required clarification or additional information, and that IPS had extensive communications with Zachry during that work (Doc. 105 at 139–40). Birmingham then placed the hoist frame into a dated sequence, testifying that revised IFC drawings for the hoist frame did not issue until March 13, 2021 and that this delayed their fabrication, delivery, and installation activity (Doc. 122 at 131–32). He further tied those design changes to a later change order issued April 28, 2021 for changes made "after and during fabrication and installation" (*id.*). Whatever the ultimate damages awarded, the hoist-frame evidence supports IPS's larger causation narrative: design-revision delays led to fabrication and delivery delays, and in turn, installation-sequencing problems.

This Court credits the testimony of Birmingham, IPS's retained delay-damages expert, who explained the Project timeline and described impacts including drawing delays and changes, and later schedule impacts tied to those changes and the related effects on work sequencing (Doc. 122 at 7–22). Birmingham's testimony also addressed the absence of any document establishing the February 2, 2021 reset schedule as a basis for liquidated damages, and the inconsistency in Rimkus's "picking and choosing" of scope dates, without supporting contractual or contemporaneous documentary support (*id.* at 223–224).

The contemporaneous emails and Project records outlined in the Birmingham materials further tied critical-path impacts and labor stacking and sequence problems to design-change timing and field directives. For example, a March 24, 2021 email from Dearth to Loc To describes multiple causes of inefficiency, including trade stacking (Trial Ex. 292), and a similar April 28, 2021 notice from RMF Nooter to Kraft identifies inefficiencies associated with condensed schedule conditions, including overtime and trade stacking (Trial Ex. 615). This Court does not treat these exhibits as proving a certain amount of damages at this stage, but they materially corroborate that the impacts

being experienced were communicated in real time and were tied to changing conditions and sequence compression.

On this record, IPS has established liability on its delay theory. The Project encountered owner-driven and design/drawing-related problems and later change-driven delays that affected the critical path and forced out-of-sequence and stacked work. These inefficiencies are supported by the expert narrative, which is anchored in contemporaneous Project documents (*see* Doc. 122 at 7–22, 223–26). Though several change orders were recognized and paid, that does not bar later recovery for delay and productivity impacts. *See Rabin v. Anthony Allega Cement Contractor, Inc.*, 2001 WL 1355979, at *9 (Ohio Ct. App. 2001) (noting that where the parties intend a change order to provide complete compensation for a given change, the compensated party may be foreclosed from seeking additional compensation, only if the record supports that intent).

***Notice.*** A recurring defense theme was that IPS did not provide timely or contractually compliant notice of its delay claim. The record, however, supports that Kraft was on notice throughout the Project that IPS was asserting schedule delays and cost impacts. And Kraft understood those impacts across the very categories at issue here: drawings, steel and IMP procurement, the hoist frame, the kitchen platform, and labor inefficiencies driven by compression.

First, notice appears in the day-to-day project communications on the delay issues. Loc To received contemporaneous written warnings about drawing/redline timing delaying steel fabrication and delivery and holding up related items, such as the IMP panels (Doc. 103 at 68–69). As the IMP issues matured, Dearth again raised them directly with Loc To in February 2021, emphasizing the urgency of shop drawing approvals, which were critical to production and delivery timing (Docs. 103 at 103–05; 104 at 155–57; Trial Ex. 488). The kitchen-platform record likewise reflects repeated communications to Loc To about fabrication confusion and delay risk (Doc. 103 at 131–36). These included a Universal email, Dearth's follow-up urging the parties to keep the

change order moving "so as not to create delays," and the June 3 direction to proceed subject to design and inspection conditions (Trial Exs. 442, 316).  The hoist-frame issues were similarly reflected as a known set of structural items requiring repeated clarification and reissuance (Docs. 105 at 139–141; 122 at 131–32).  And the labor inefficiency issues were communicated as the work progressed through the written communications Birmingham identified, which included trade stacking, overtime, and condensed work-front conditions (Doc. 122 at 117–120; Trial Exs. 292, 615).

Second, Kraft's notice is reflected in the Project's established meeting and administration practices.  As outlined above, testimony reflects that compensation disputes were administered during performance through the Project's change-order process, including change orders to address evolving conditions.  That testimony is consistent with the broader documentary and testimonial record showing ongoing evaluation and processing of changes.  Boyd likewise described that disputed items, particularly those framed as broader inefficiency or impact claims, were not handled as routine field change orders, but required procurement involvement and review under the Contract framework (Doc. 104 at 21–25).  *See Roger J. Au & Son, Inc. v. Ne. Ohio Rg'l Sewer Dist.*, 29 Ohio App. 3d 284, 284–85 (Ohio Ct. App. 1986) ("A failure of written notice under differing site conditions and changes clauses may be harmless if there is constructive notice to the owner of the differing conditions.").

Third, the record reflects formal claim communications and Kraft's engagement with them.  In addition to the day-to-day notice embedded in the project correspondence, the trial testimony addressed IPS's REA submissions and follow-up analysis transmissions, and it reflects Kraft's internal routing and review of those submissions (Doc. 114 at 51–53, 120–22; Trial Exs. 29, 130, 232).  Kraft responded by reviewing, requesting substantiation, and engaging procurement, which

16

further supports that Kraft treated the submissions as developing claims, rather than as a surprise raised only after the work concluded (Docs. 104 at 21–25; 114 at 120–31).

IPS summarized the record evidence showing it provided notice via emails and project meetings and that Kraft internally discussed IPS's claims and damages, making it impossible that Kraft lacked notice (Tr. at 7–10). In that framework, the record reflects many communications and meeting minutes on drawings, submittals and approvals, platform communications and RFIs, sourcing issues, and written inefficiency notices (*see* Trial Exs. 13, 15, 19, 25–26, 64–65, 87, 91, 98, 100, 102–03, 118–19, 121, 154, 170, 172, 173, 209, 212–13, 292, 315, 320, 481, 492, 615–16).

Further, the record underscores that the Project's evolving conditions and directives continued beyond any supposed "clean slate" moment, and the existence of continuing record-based impacts undermines Kraft's assertion that a single reset extinguished or cured all impacts (Doc. 122 at 223–24; Tr. at 25–27). Birmingham identified contemporaneous records documenting changed directives and extra work continuing through the end of 2021 and into 2022, reinforcing that notice and impact were not confined to a narrow, early period (Doc. 122 at 223–25). At minimum, the record reveals constructive notice. *See Lucero v. Ohio Dep't of Rehab. & Corr.*, 2011 WL 6171366, at *5 (Ohio Ct. App. 2011) ("While actual notice exists where the information was personally communicated to or received by the party, '[c]onstructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice.'") (citation omitted).

On liability, this Court therefore finds the notice element satisfied. Kraft had actual knowledge -- through contemporaneous communications tied to the specific delay issues, the project's meeting and change-order practices, and later formal REA submissions, that IPS was asserting delay-related impacts and pursuing relief. Kraft acknowledged these delays with ongoing consideration.

**Unjust Enrichment**

Unjust enrichment is an equitable doctrine that applies only when there is no adequate remedy at law and the defendant has retained a benefit under circumstances that make it unjust to do so. Under Ohio law, the elements include: "(1) a benefit is conferred by a plaintiff on a defendant; (2) the defendant knows about the benefit; and (3) the defendant retains the benefit under circumstances where it is unjust to do so without payment." *Clifton v. Johnson*, 2019 WL 2763002, at *3 (Ohio Ct. App. 2019) (citation omitted).

Ohio courts, however, have long treated unjust enrichment as a gap-filling remedy, as opposed to a vehicle to repackage contract disputes. Where an express contract governs the parties' relationship and covers the subject matter of the dispute, the law does not permit recovery in quasi-contract for the same performance. *See Gallo v. Westfield Nat'l Ins. Co.*, 2009 WL 625522, at * 3 (Ohio Ct. App. 2009) (noting unjust enrichment is unavailable where a valid, enforceable written contract governs the dispute). Federal courts applying Ohio law are in accord: "[A] plaintiff may not recover for unjust enrichment where an express contract governs the subject matter of the litigation." *MRI Software LLC v. Univ. of Minnesota Found. – Dinnaken Hous., LLC*, 2024 WL 3052071, at *5 (N.D. Ohio 2024).

That principle controls here. The parties' relationship was governed by an express contractual framework, including the CSA and purchase orders, administered through a change-order and claims process. The contract supplies the governing measure for whether compensation is owed and, if so, in what amount. And the remaining compensation dispute will be addressed in the next phase under the delay theory. In these circumstances, equity does not supply a parallel track for recovery that would effectively rewrite the parties' bargain or bypass the Contract.

**Lien Foreclosure**

Finally, this Court addresses IPS's lien-foreclosure claim.  Kraft argues that the "foreclosure" theory as pled is not a proper statutory foreclosure action (Tr. at 39).  In light of this Court's denial of Kraft's lien invalidity theories, and with delay damages still to be calculated, foreclosure cannot be resolved at this phase.

This claim is therefore dismissed without prejudice to renewal in an appropriate procedural posture consistent with state-law foreclosure requirements and the eventual damages determination.

## Conclusion

From the outset, this was a Project asked to run at full speed before it had its footing.  It started with unfinished drawings, unclear directions, and an aggressive schedule.  And it only worsened as the months went on -- late revisions, out-of-sequence work, compressed trades, and constant change activity.  The result was not due to any single, isolated mistake.  Rather, this complex job became more difficult with every attempt to "catch-up."  And by the end, the parties were left arguing over the foreseeable consequences of such a Project.  The record squarely supports a delay dispute that developed in real time as the Project unraveled.  Because IPS has established a valid delay claim, this case now proceeds to damages -- how much of the delay is attributable to Kraft, and how much is owed to IPS.

IT IS SO ORDERED.

　　　　　　　　　　　　　　　　　　　　　　s/ *Jack Zouhary*
　　　　　　　　　　　　　　　　　　　　　　JACK ZOUHARY
　　　　　　　　　　　　　　　　　　　　　　U. S. DISTRICT JUDGE

　　　　　　　　　　　　　　　　　　　　　　February 13, 2026